UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:15-cr-00040-JAW-09 |
| | ) | |
| AKEEN OCEAN | ) | |

**ORDER ON MOTION TO SUPPRESS**

Akeen Ocean, charged with one count of engaging in a conspiracy to distribute cocaine base, seeks to suppress statements he made to law enforcement officers during their investigation on the grounds that he was in custody during the interrogation and was never read his *Miranda*[1] rights and that, in any event, his statements were not voluntary.  The Court held an evidentiary hearing on May 18, 2016, at which both the involved officers and Mr. Ocean testified and other record evidence was admitted.  The Court denies the motion to suppress because it concludes that Mr. Ocean was not in custody during the police interview and that Mr. Ocean gave his statements voluntarily.

I. **PROCEDURAL BACKGROUND**

On February 12, 2015, a federal grand jury indicted Akeen Ocean along with ten others, charging them with engaging in a conspiracy to distribute cocaine base. *Indictment* (ECF No. 3).  Mr. Ocean pleaded not guilty to the charge on February 20, 2015.  *Entry* (ECF No. 74).  On September 9, 2015, Mr. Ocean moved to extend the time for filing pretrial motions, *Def.'s Mot. to Re-Open Pretrial Mots. Deadline* (ECF

---

[1]   *Miranda v. Arizona*, 384 U.S. 436 (1966).

No. 273), and moved to suppress evidence, the recovery of which he contended violated the United States and state of Maine constitutions. *Def.'s Mot. to Suppress Statements Obtained in Violation of Def.'s Const. Rights* (ECF No. 275). On September 10, 2015, the Government moved to strike Mr. Ocean's motion to suppress as untimely and failing to comply with Local Rule 147(a), *Gov't's Mot. to Strike Def.'s Mot. to Suppress* (ECF No. 276), and also objected to Mr. Ocean's late filing and motion to reopen the pretrial motions deadline. *Gov't's Obj. to Reopen Pretrial Mots. Deadline* (ECF No. 277).

On September 14, 2015, Mr. Ocean filed an amended motion, asking the Court to reset the pretrial motions deadline, *Am. Def.'s Mot. to Re-Set Pretrial Mots. Deadline* (ECF No. 280), and also submitted an amended motion to suppress. *Am. Def.'s Mot. to Suppress Statements Obtained in Violation of Def.'s Constitutional Rights* (ECF No. 281) (*Def.'s Am. Mot.*). On September 17, 2015, the Government objected to Mr. Ocean's motion to reopen the pretrial motions deadline, *Gov't's Obj. to Reopen Pretrial Mots. Deadline* (ECF No. 283), and on September 28, 2015, the Government moved to strike Mr. Ocean's amended motion to suppress. *Gov't's Mot. to Strike Def.'s Am. Mot. to Suppress* (ECF No. 288) On October 14, 2015, Mr. Ocean responded to the Government's objection to the resetting of the pretrial motions deadline, *Resp. to Gov't's Obj. to Re-Set Pretrial Mots. Deadline* (ECF No. 310), and on October 15, 2015, Mr. Ocean responded to the Government's motion to strike his motion to suppress. *Reply to Gov't's Mot. to Strike Def.'s Mot. to Suppress* (ECF No. 312).

On December 18, 2015, the Court granted Mr. Ocean's motion to reset the pretrial motions deadline, dismissed his original motion to suppress as moot, and denied the Government's motion to strike Mr. Ocean's motion to suppress and his amended motion to suppress. *Order on Pending Matters* (ECF No. 336). Subsequently, on January 15, 2016, the Government filed a response to Mr. Ocean's amended motion to suppress. *Gov't Obj. to Def.'s Am. Mot. to Suppress* (ECF No. 355) (*Gov't Opp'n*). Accompanying its response, the Government filed an affidavit of Detective Martin Podsiad, *Aff. of Martin Podsiad* (ECF No. 355-1) (*Podsiad Aff.*), an audio recording of an interview of Mr. Ocean conducted by law enforcement on September 4, 2014, (ECF No. 355-2), and the transcripts of that interview. *9/4/2014 Interview of Akeen Ocean*. (ECF Nos. 355-3, 355-4) (*Tr.*).

On February 12, 2016, Mr. Ocean filed a motion to request a hearing on his motion to suppress, *Def.'s Mot. to Request Hr'g on Mot. to Suppress Statements* (ECF No. 373) (*Mot. for Hr'g*), and an affidavit in support of his motion to suppress. *Aff. in Supp. of Mot. to Suppress Statements.* (ECF No. 373-1) (*Def.'s Aff.*). Mr. Ocean filed a reply to the Government's response on February 29, 2016. *Def.'s Reply to Gov't Obj. to Def.'s Mot. to Suppress* (ECF No. 380) (*Def.'s Reply*). The Government filed a sur-reply on March 21, 2016. *Gov't Sur-Reply in Obj. to Def.'s Am. Mot. to Suppress* (ECF No. 398). The Court held an evidentiary hearing on Mr. Ocean's motion to suppress on May 18, 2016. *Entry* (ECF No. 443) (*Suppression Hr'g*).

## II.   FINDINGS OF FACT[2]

---

[2]     Mr. Ocean's testimony from the suppression hearing, as well as his sworn affidavit, tell a story that conflicts in many material respects with the testimony provided by the Government's three

witnesses, Detectives Podsiad, Merced, and Kyle of the New Haven, Connecticut Police Department. After reviewing the record evidence and the testimony of the Detectives – whom the Court found to be credible witnesses – and comparing it with the testimony of Mr. Ocean, the Court accepts the testimony of the officers over the testimony of Mr. Ocean.

First, in the affidavit submitted by Mr. Ocean – signed by him "under the pains and penalties of perjury" – Mr. Ocean stated that he told the Detectives after they had approached him that "it wasn't a good time because he was watching his young son inside the apartment," and that he did not "consent for an interview and he felt that if he didn't comply and walk to the vehicle, he would be taken to jail and his son would be left inside the residence alone." *Def.'s Aff.* at 1. However, during the suppression hearing Mr. Ocean stated that his girlfriend and his cousin were in the house with his son when he was interviewed by the Detectives. *See also Tr.* at 21. The Detectives also stated they saw a female go inside as they approached the apartment. It appears his son would not be left alone.

Mr. Ocean also asserted in his affidavit that Detective Podsiad told him while Mr. Ocean was standing on his porch that they "drove all the way up from New Haven, Connecticut, and they weren't leaving without answers." *Def.'s Aff.* at 1. At the suppression hearing Mr. Ocean stated that Detective Podsiad told him that he could be on the winning team or the losing team, and that he believed he had no alternative other than talking to them in the car or he would be arrested. In contrast, all three Detectives testified that they never told Mr. Ocean that he had to speak with them in the vehicle, never told him that they would take him to jail if he did not talk to them, and never told him that they were not leaving without answers and never threatened him in any way. Later, on cross-examination, Mr. Ocean admitted that at no point in time did Detective Podsiad tell him he was going to arrest him, take him to jail, or search his home if he did not talk to them in the vehicle that day.

At the hearing Mr. Ocean testified that Detective Podsiad told him when Mr. Ocean was on the porch that if he was on the losing team the Detective would kick down his door, throw in flashbangs, and take him by gunpoint in front of his son. The tape of the interview in the vehicle confirms the following interchange between Mr. Ocean and Detective Podsiad:

> Podsiad:  Okay.  Um, so this what kinda is gonna happen, all right?  Um, we basically are doing these preliminary interviews like I said, we've been up here plenty of times, we've already picked up plenty of people and how it usually works on the federal side is this, we have information, you know from numerous interviews, um, you know, that says about you A, B, C, D whatever.
> Ocean:  Yeah.
> Podsiad:  We look at that and we're like okay how bad is this person, do we, do we, is it something that we want to make him a defendant and sometimes when you become a defendant, we don't even fucking tell ya, we just come kick in your door, throw a couple flash bangs, and drag you out at gunpoint.
> Ocean:  I ain't.
> Podsiad:  You're done.  And that's how we did Rico the other day.
> Ocean:  Yeah, I heard, I don't want no cause for that shit.
> Podsiad:  Yeah, so well obviously we don't think you're that bad of a person cause we're sitting here having this conversation.
> Ocean:  Conversation.

*Tr.* at 7.  Later, the following interchange took place between Mr. Ocean and Detective Podsiad:

> Ocean:  All right.  So, do I gotta wait until someone come kicking in my door?
> Podsiad:  No.  That would have happened.  We wouldn't have come and done this.
> Ocean:  All right yo.  I appreciate it.  I appreciate it . . . .

*Id.* at 10.  Detective Podsiad ended the interview by saying:

4

In early September, 2014, as part of the investigation into the illegal activities of a New Haven, Connecticut based street gang known as the Red Side Guerilla Brims (RSGB), several officers and agents from the New Haven Police Department (NHPD) and the New Haven Office of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) travelled to Bangor, Maine to work with Maine Drug Enforcement Agency

---

Podsiad:  Have a good one and you'll be hearing from somebody from around here, they'll either drop a letter to you or whatever or they'll come talk to you, but you don't have to worry about getting your shit kicked in or none of that.

*Id.* at 12.

Juxtaposed, all three Detectives testified that Detective Podsiad would never make such statements in an effort to get someone to talk.  Detective Podsiad testified that was not something he would say to anybody that he was trying to get to cooperate with a criminal investigation.  Moreover, Detectives Merced and Kyle testified that they had done numerous interviews with Detective Podsiad in their career and that they had never heard him use those types of incendiary terms when trying to persuade somebody to agree to an interview.

In addition, the Court notes that Mr. Ocean did not make this accusation in his affidavit, and it is odd that Mr. Ocean's recollections of these threats, which go to the heart of voluntariness, first came to light at the suppression hearing.  These were experienced detectives; it is improbable that they would have this forceful, incendiary conversation across a distance with Mr. Ocean standing on his porch in a semi-public setting.  Should anyone have overheard the conversation, it might have compromised Mr. Ocean's potential cooperation and revealed him as a potential witness.

Based on the interview in the vehicle, the Court concludes that Mr. Ocean misremembered when the discussion about kicking down the door took place.  The Court finds that it took place not at the porch, but in the vehicle toward the end of the interview when Detective Podsiad was discussing what would happen next.  As it in fact occurred in the vehicle in the middle of their conversation, the description of this forcible arrest did not affect Mr. Ocean's decision to come to the vehicle and speak with the Detectives.

In addition, Mr. Ocean testified that while they talked outside of his home Detective Podsiad told him that cooperating with them that day could lead to a proffer and immunity.  The three Detectives testified that they never offered him immunity or the opportunity to proffer while talking outside his home, and Detective Podsiad said he would never discuss proffers or immunity while talking outside, as he would not have this type of conversation with a potential witness or defendant in an area open to public disclosure.

Finally, Mr. Ocean also testified that he did not go back inside his home before joining the Detectives for the interview in their vehicle.  Mr. Ocean said that while he was standing on his porch, he only opened the door, never stepping inside, and yelled that the Detectives were making him go to the car to talk to them.  All three Detectives testified that, while they waited in his driveway, Mr. Ocean entered his home for a brief period before joining them in their vehicle.  Also, the Court notes that it seems unlikely that if Mr. Ocean was so concerned about being seen and heard talking with law enforcement that he would yell through the door that he was going to talk to them in their vehicle instead of walking inside and relaying this information in private.

For these reasons, the Court has accepted the testimony of the Detectives over the testimony of Mr. Ocean concerning the events leading to the taped discussion among Detective Podsiad, the other Detectives, and Mr. Ocean in the vehicle.

(MDEA) agents in conducting interviews and engaging in enforcement activity. *Podsiad Aff.* at 1.  On the afternoon of September 4, 2014, Detectives Martin Podsiad, Josh Kyle, and Alberto Merced of the NHPD interviewed Mr. Ocean concerning his knowledge of the RSGB activity.  *Id.*

The Detectives were dressed in plain clothes, not wearing anything that identified them as police officers, and their service weapons were concealed under their clothing.  *Id.* at 2.  Their badges were on their belts.  *Suppression Hr'g.*  Not long after arriving at Mr. Ocean's residence, while walking up the driveway, the Detectives observed Mr. Ocean and a woman on the porch of his apartment.  *Id.*  The woman went inside the apartment before the officers arrived.  *Id.*  Mr. Ocean remained standing on the porch and the three detectives arrived and stood in his driveway, approximately 10-15 feet away from Mr. Ocean.  *Id.*

Detective Podsiad told Mr. Ocean that they were police officers, that they were not there to arrest anyone, and that they simply wanted to talk.  *Podsiad Aff.* at 2. Detective Podsiad explained to Mr. Ocean that they were from New Haven, Connecticut and were working on a federal investigation into some illegal activity in the Bangor and New Haven areas.  *Id.*  Detective Podsiad was the only detective who spoke to Mr. Ocean while the detectives stood in the driveway.  *Suppression Hr'g.* Detective Podsiad provided Mr. Ocean with some additional details, and Mr. Ocean initially claimed that he did not know anything.  *Podsiad Aff.* at 2.  Detective Podsiad explained to Mr. Ocean that all he wanted to do was talk and that he was not there

to arrest Mr. Ocean or search his residence. *Id.* Upon hearing this, Mr. Ocean indicated that he would talk to the Detectives. *Id.*

When Detective Podsiad suggested that they get off the porch and talk in the apartment, Mr. Ocean indicated that he did not want to do that as his young son was inside. *Id.* When Detective Podsiad suggested that they just talk on the porch, Mr. Ocean expressed reluctance about standing on his porch and talking to the three Detectives. *Id.* Detective Podsiad then suggested that his vehicle was up the street and they could go sit in the vehicle and talk. *Id.* Mr. Ocean agreed, went into his residence for a moment, and then returned and walked up the street to the vehicle with Detectives Podsiad, Kyle, and Merced. *Id.* From the time the Detectives arrived in Mr. Ocean's driveway to the time all four men entered the vehicle neither the Detectives nor Mr. Ocean raised their voices or argued. *Suppression Hr'g.*

The vehicle Detective Podsiad was operating was not a marked patrol vehicle; it was an unmarked SUV rented by ATF. *Podsiad Aff.* at 2-3. The vehicle was parked on a public street within view of Mr. Ocean's residence. *Id.* at 3. The vehicle was not equipped with a cage or automatically locking rear locks. *Id.* The doors were unlocked the entire time Mr. Ocean was in the vehicle. *Suppression Hr'g.* There was nothing limiting Mr. Ocean's ability to leave the vehicle once he entered. *Podsiad Aff.* at 3. Upon arriving at the vehicle, Detective Podsiad got in the driver's seat and activated his recording device. *Id.* Detective Merced got in the front passenger seat, while Mr. Ocean and Detective Kyle got in the back seat. *Id.* Before entering the

vehicle Mr. Ocean was not searched, and at no time was Mr. Ocean handcuffed or otherwise restrained.  *Id.*

In the vehicle Detective Podsiad told Mr. Ocean that they were investigating a case that spanned the last seven years, that Mr. Ocean had to "answer up" for everything during that time, and told Mr. Ocean not lie to him, as they were there to test his truthfulness.  *Tr.* at 1.  Detective Podsiad informed Mr. Ocean he could lie in two ways: (1) either directly, at which that point he would tell Mr. Ocean to "get the fuck out of my car, and we'll see you in federal court," or (2) by omission, by not telling him information that Mr. Ocean knew.  *Id.* at 2.  When discussing with Mr. Ocean his involvement in the drug conspiracy under investigation,  Detective Podsiad asked Mr. Ocean not to minimize his estimates of the drug quantities that he sold or purchased and told Mr. Ocean that he was not building a drug case against him and that if they wanted to do a case on him, they already had enough to arrest him.  *Id.* at 7-8.

About half way through the interview Mr. Ocean asked if he was in trouble, and Detective Podsiad replied that he was not in trouble at that moment, but that he could potentially be and that was why the Detectives had come to talk to him.  *Id.* at 15.  Also, in describing the investigation process, Detective Podsiad told Mr. Ocean that when they determine "how bad" a person is, sometimes if they "want to make him a defendant," they "don't even fucking tell ya, we just come kick in your door, throw a couple flashbangs, and drag you out at gunpoint," which was how they arrested one of Mr. Ocean's now co-defendants a few days before coming to speak with

Mr. Ocean. *Id.* at 19.   Detective Podsiad followed this up by telling Mr. Ocean that "well obviously we don't think you're that bad of a person cause we're sitting here having this conversation." *Id.*

Detective Podsiad told Mr. Ocean that after their interview the Detectives would go speak with Assistant United States Attorney Joel Casey, who would decide whether Mr. Ocean is "worthwhile to use as a witness," or if they "should go after him as a defendant." *Id.* at 20.   If he were to be made a defendant, Detective Podsiad described the prison sentence Mr. Ocean faced as "you could potentially be looking at like ten to fifteen years somewhere in Dakota." *Id.* at 21.   He then told Mr. Ocean that "so what is gonna happen is this, Joel Casey is probably gonna send out one of the local cops to deliver a letter to you.  It's either gonna be a target letter or a grand jury subpoena. Either way, they're gonna provide you . . . with an attorney." *Id.* Detective Podsiad then told Mr. Ocean that:

> The attorney is gonna advise you, you know, as to far as what you're looking the whole nine, and usually on the federal side . . . you get to proffer, and what the proffers states is, listen, we're sitting you down, we want to use you as a witness, they might have you cop out to some bullshit or whatever, well what they do is give you full immunity, all right, on anything you might have done, so they basically tell you this is your one time deal to tell us fucking everything you might have done wrong. The only way you could fuck up a proffer is if you lie.

*Id.*

Toward the end of the interview Mr. Ocean and Detective Podsiad had the following exchange:

Ocean:     All right, um, can I go back home now and like?

Podsiad:     We're gonna let you go.

| | |
|---|---|
| Ocean: | I'm just scared, like. |
| Podsiad: | I just wanted to explain all of that to you. |
| Ocean: | All right, so, do I gotta wait until someone come kicking in my door? |
| Podsiad: | No. That would have happened. We wouldn't have came and done this. |
| Ocean: | All right, yo, I appreciate it. I appreciate it. I be having my son in here, and I am who I am, but I'm keeping it real, yeah, I'm scared, that's some shit, like, I did my drugs or whatever, but I ain't no into guns and no [kingpin] shit or none of that shit. . . . |

*Id.* at 22.

At one point during the conversation a marked sheriff's vehicle drove past Mr. Ocean's residence. *Podsiad Aff.* at 3; *Tr.* at 19-20. When Detective Podsiad asked Mr. Ocean if the sheriff's office was looking for him, he indicated that it had something to do with his child support obligations. *Podsiad Aff.* at 3. Detective Podsiad did not alert the deputy driving the marked sheriff's office vehicle that Mr. Ocean was sitting in the vehicle. *Id.*

The conversation with Mr. Ocean in the vehicle lasted approximately twenty-five minutes. *Id.* When the conversation was over, Mr. Ocean let himself out of the vehicle and walked back to his residence. *Id.* During the time they were in the vehicle the Detectives asked Mr. Ocean questions, answered Mr. Ocean's questions, and occasionally joked and made small talk. *Id.* Mr. Ocean never received any *Miranda* warnings. *Def.'s Aff.* at 2.

## III. THE PARTIES' POSITIONS

## A.      Mr. Ocean's Amended Motion to Suppress

Based on the totality of the circumstances analysis set out in *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984), Mr. Ocean argues that "it is very likely that the court would find that when a person is compulsorily removed from his home for an interrogation into the back of a police vehicle, and then threatened with violence and federal prison time without cooperation, that he was certainly in custody for *Miranda* purposes." *Def.'s Am. Mot.* at 3.  Citing caselaw, Mr. Ocean lists factors to determine whether someone is in custody under *Miranda*:

> The time, place, and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions.

*Id.* at 3-4 (collecting cases).

Mr. Ocean notes a "split in authority" on "whether, when questioning an individual in the back of a police car, the individual is considered to be 'in custody' to require a reading of *Miranda* rights."   *Id.* at 4.   Citing Fourth and Sixth Circuit caselaw, Mr. Ocean argues that the totality of the circumstances and the reasonable person test make clear that "a reasonable person would not feel free to leave nor did the detectives have any inclination to let him leave until he was finished answering their questions."   *Id.* at 5.  Mr. Ocean concludes that, considering that the detectives "persistently interrogated [him]," "[t]he entire examination was very intense and full

11

of threats," and that he was "not free to leave," he was in custody under *Miranda*, and because he was not advised of his rights under *Miranda*, any statements he made must be suppressed. *Id.* at 5-6.

Further, Mr. Ocean contends that even if his *Miranda* rights were not violated, his statements are inadmissible because they were made involuntarily. *Id.* at 6 (citing *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987)). He contends that a confession is involuntary if it is not "the product of a rational intellect and a free will," *id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 398 (1978)), and that coercive police conduct is a necessary predicate to finding involuntariness. *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Mr. Ocean contends his statements were a product of threats of violence and harsh prison terms, as well as false representations of the law and false promises, and as such was involuntary and must be suppressed. *Id.* at 8.

### B.    The Government's Response

Citing an abundance of Supreme Court and First Circuit caselaw on the *Miranda* doctrine and the issue of custody, *Gov't's Opp'n* at 4-7, the Government asserts that the affidavit of Detective Podsiad and the audio recording and transcript of the September 4, 2014 interview of Mr. Ocean demonstrate that he was not in custody during the interview in the vehicle. *Id.* at 7. Specifically, the Government contends that the Detectives only conducted the interview in the vehicle after Mr. Ocean indicated he would feel more comfortable talking there, that he was not searched or handcuffed at any point during the conversation, that the vehicle was

parked, and that it was a unmarked rental vehicle with no security cage and no impediments to Mr. Ocean leaving. *Id.* Moreover, the Government asserts that the tone of the conversation was convivial, that the officers never hollered at, berated or threatened Mr. Ocean, that Detective Podsiad asked the majority of the questions, and at the end of the conversation Mr. Ocean left the vehicle of his own will. *Id.* The Government argues that the facts presented here are very similar to those in *United States v. Poland*, No. CRIM. 05-69-P-H, 2006 WL 163409, *4-5 (D. Me. Jan. 19, 2006), *report and recommendation adopted*, 2006 WL 1030097 (D. Me. Apr. 14, 2006), where the District of Maine denied a defendant's motion to suppress his statements. *Id.*

## C.    Mr. Ocean's Reply

In response to the Government, Mr. Ocean filed an affidavit attesting to his version of the events that transpired on September 4, 2014, and filed a motion asserting that his affidavit creates a factual dispute that requires a hearing on the issue. *Mot. for Hr'g* at 1; *Def.'s Aff.* at 1-2. In his reply to the Government's motion, Mr. Ocean submitted "no further argument or evidence on this issue." *Def.'s Reply* at 1.

## D.    The Government's Sur-Reply

In response to Mr. Ocean's argument that his confession was involuntary, the Government asserts that there is nothing in his affidavit to support his contention that he was led to believe that "if he didn't cooperate and confess that he would be thrown in a federal prison; alternately if he did cooperate, he was led to believe he would be offered immunity and that the detectives would build their case on a

different individual and leave him alone." *Gov't Sur-Reply* at 2 (citing *Def.'s Am. Mot.* at 8). The Government contends that other than Mr. Ocean's argument, "there is no objective evidence that the defendant was threatened, subjected to violence, or made promises by the officers who interviewed him such that his will was overborn." *Id.*

## IV.   DISCUSSION

The government bears the burden of proving *Miranda* compliance, *United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), and the voluntariness of a confession. *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990).

### A.   Asserted *Miranda* Violation

"In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Bram v. United States*, 168 U.S. 532, 542 (1897). In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established "rules of police procedure applicable to 'custodial interrogation.'" *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). It held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. From there, the Court prescribed the classic "*Miranda* warning," requiring that any custodial interrogation be preceded with cautionary

advice that the suspect has "a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

The *Miranda* warning was deemed necessary to combat the "'compelling pressures' inherent in custodial police interrogation" and safeguard the Fifth Amendment. *Dickerson v. United States*, 530 U.S. 428, 440 (2000) (quoting *Miranda*, 384 U.S. at 467). However, for *Miranda* warnings to be required the individual must be in custody; noncustodial questioning requires no warning. *Mathiason*, 429 U.S. at 495; *United States v. Quinn*, 815 F.2d 153, 160 (1st Cir. 1987). Thus, for Mr. Ocean's motion to succeed on the basis of a *Miranda* violation, he must have been in custody at the time of his unwarned statements. *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011).

For a suspect to be in custody, he must be subject to either formal arrest or an equivalent restraint on his freedom of movement. *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Mathiason*, 429 U.S. at 495. The restraint imposed on a suspect's movement need not be physical. Custody may arise where the suspect is "otherwise deprived of his freedom of action in any significant way," including through the imposition of psychological pressures. *United States v. Rogers*, 659 F.3d 74, 77 (1st Cir. 2011) (quoting *Miranda*, 384 U.S. at 444). "Significant deprivation occurs in circumstances carrying a 'badge of intimidation,' or 'inherent compulsions,'" *id.* (quoting *Miranda*, 384 U.S. at 457, 467), "or as the Supreme Court later put it, in circumstances that 'blur[ ] the line between voluntary and involuntary statements,

and thus heighten[ ] the risk' that the Fifth Amendment privilege will not be appreciated." *Id.* at 77-78 (quoting *Dickerson*, 530 U.S. at 435).

Two objective tests are prescribed to assist in the task of differentiating between scenarios that would, or would not, be custodial in nature. Initially, courts consider "whether a reasonable person in the circumstances would have felt 'at liberty to terminate the interrogation and leave.'" *Id.* at 78 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). If not, then the second inquiry is "whether those circumstances would have been likely to coerce a suspect to engage in back and forth with the police, as in the paradigm example of traditional questioning." *Id.* (quoting *Berkemer*, 468 U.S. at 436-37).

Under the first, reasonable person test, "[a]mong the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings,"[3] "the number of law enforcement officers present at the scene," "the degree of physical restraint placed upon the suspect,"[4] and "the duration and character of the interrogation."[5] *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (internal citations and quotations omitted). Relevant factors also include the statements made during the interview, *Mathiason*, 429 U.S. at 495,[6] and the release of the interviewee at the end of the questioning. *See Beheler*, 463 U.S. at 1122-23.

---

[3]   *See also Maryland v. Shatzer*, 559 U.S. 98, 110-115 (2012).
[4]   *See also New York v. Quarles*, 467 U.S. 649, 655 (1984).
[5]   *See also Berkemer*, 468 U.S. at 437-438.
[6]   *See also Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004); *Stansbury v. California*, 511 U.S. 318, 325 (1994).

"Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). If a reasonable person in the circumstances would not feel at liberty to terminate the interrogation and leave, the question becomes whether an objective person would have felt coerced to engage in a back and forth with the police. *Rogers*, 659 F.3d at 77; *see also Shatzer*, 559 U.S. at 112.

Questioning of a suspect in a police vehicle does not automatically render a suspect "in custody." *United States v. Speal*, No. 97–3344, 1998 WL 886757, at *5 (10th Cir. Dec. 21, 1998); *United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996). Rather, courts have considered, inter alia, such factors as whether the car was unmarked, unlocked, or stationary, whether the suspect was physically restrained, whether the police car was located in a public or familiar (versus isolated) setting, the length and tone of the interview, and the number of officers conducting it. *See, Speal*, 1998 WL 886757, at *5 (suspect not "in custody" during pre-*Miranda* detention in patrol car following traffic stop when (i) there was no evidence of coercion by officer, (ii) conversation took place in front seat of patrol car on shoulder of public highway during day, (iii) conversation was not excessive in length, (iv) suspect was not handcuffed and within eyesight of his companion, whom he had witnessed being questioned and released, and (v) windy, chilly conditions justified relocation); *United States v. McKinney*, 88 F.3d 551, 553-55 (8th Cir. 1996), *overruled on other grounds by United States v. LeBrun*, 363 F.3d 715 (8th Cir. 2004) (suspect not "in custody" when he was questioned for brief period in backseat of sheriff's car outside his home,

he was not handcuffed, there was no evidence he was unable to open car doors, he did not invite officers into his home upon arrival despite rain, and he willingly sat in sheriff's car); *United States v. Rainbow*, 380 F. Supp. 2d 1071, 1078-79 (D.N.D. 2005) (18-year-old suspect not "in custody" during questioning in unmarked sport utility vehicle parked in his driveway when (i) he was informed at outset he was not in custody or under arrest, would not be arrested and could terminate interview at any time, (ii) he was not handcuffed, escorted or placed into vehicle but rather walked out of his home without restraint and got into it, (iii) doors to vehicle were unlocked and (iv) interview was cordial and voluntary); *United States v. Luchetti*, No. 11-CR-143A, 2012 WL 6949520, at *5 (W.D.N.Y. Aug. 10, 2012) ("the fact that the interview took place in a vehicle owned by [law enforcement] does not, without more, require a finding that any statements made by the defendant were the subject of a custodial interrogation"); *Poland*, 2006 WL 163409, at *4-5 (defendant not in custody during interview in unmarked vehicle outside of his residence where defendant agreed to speak to officer in vehicle and officers did not tell him he was not free to leave; "[q]uestioning of a suspect in a police vehicle does not automatically render a suspect 'in custody'").

The Court concludes that Mr. Ocean was not in custody while being interviewed by the Detectives.   The circumstances of this case have a strong similarity to those in *Poland*, where the District of Maine found the defendant was not in custody during an interview in a law enforcement vehicle.  2006 WL 163409, at *1-3.  In *Poland* two officers approached the home of the defendant and then

suggested interviewing him in their vehicle.  *Id.*  Neither officer told the defendant he was not free to leave, the defendant was never handcuffed, he was not placed in the vehicle by the officers, and was not physically restrained in any other respect.  *Id.*  The doors were unlocked, the vehicle was unmarked, and it was parked in the defendant's driveway within sight of the defendant's home.  *Id.*  The defendant was questioned by two officers, one in full uniform with holstered weapon, the interview lasted no more than half an hour, and there is no evidence the officers adopted "a belligerent tone."  *Id.* at *5.  In one respect the situation in *Poland* was more like custody than Mr. Ocean's case.  One of the officers in *Poland* was in uniform and wore a holstered, but visible firearm.  *Id.*

Here, the Detectives were dressed in plain clothes and their service weapons were concealed under their clothing.  Because Mr. Ocean expressed reluctance about talking on his porch, Detective Podsiad suggested that they could go sit in the vehicle and talk, to which Mr. Ocean agreed.  The vehicle was an unmarked SUV rented by ATF, parked on a public street within view of Mr. Ocean's residence, was not equipped with a cage or automatically locking rear locks, the doors were unlocked the entire time, and there was nothing limiting Mr. Ocean's ability to leave the vehicle.  Prior to entering the vehicle Mr. Ocean was not searched, and at no time was Mr. Ocean handcuffed or otherwise restrained.  None of the officers told Mr. Ocean that he was not free to leave and, in fact, one of the Detectives told Mr. Ocean that if he did not tell the truth, he would have to leave the vehicle.  The interview in the vehicle lasted approximately twenty-five minutes.  The audiotape contains no suggestion that

either the Detectives or Mr. Ocean raised their voices, argued, or "adopted a belligerent tone." *Id.* When the conversation was over, Mr. Ocean let himself out of the vehicle and walked back to his home. Further, having reviewed the transcript and listened to the recording from the interview, the Court concludes that the tone of the conversation was generally cordial and respectful. Indeed, there were a few points where jokes were made and the Detectives and Mr. Ocean laughed together.[7] *See Tr.* at 4, 6, 19-20.[8]

Additionally, Detective Podsiad told Mr. Ocean that the interview was in part a means to test his truthfulness and viability as a potential witness, and, as noted earlier, that if Mr. Ocean lied to him he would tell him to "get the fuck out of [the] car" and would see him "in federal court." Telling Mr. Ocean he would be asked to leave the car if he lied indicates that Mr. Ocean could thus leave under his own free will. Also, the Court does not find the section of the interview where Detective Podsiad describes arresting Mr. Ocean's co-defendant at gunpoint to be a threat, as he concludes by telling Mr. Ocean "obviously we don't think you're that bad of a person cause we're sitting here having this conversation." *Tr.* at 19. Likewise, Detective Podsiad's discussion of potential jail time, proffers, and immunity were conveyed as a hypothetical, in a non-threatening tone, and as Detective Podsiad

---

[7]     At one point during the interview a deputy sheriff drove by Mr. Ocean's house. *Tr.* at 19. Mr. Ocean stated the sheriff was probably looking for him regarding a child support obligation and Detective Kyle joked that "you can hide in here for a minute," with Mr. Ocean thanking him and laughing. *Id.* at 20.

[8]     During his testimony at the suppression hearing, Mr. Ocean described the conversation in front of his porch as taking place in a fashion that stands in sharp contrast with the transcript and recording of the conversation that took place immediately after in the Detective's vehicle. *See* footnote 2, *supra.* The Court is skeptical that the discussion so quickly went from hostile to conversational.

testified to at the hearing, was a means of providing Mr. Ocean with information so he had a better understanding of the legal system and the potential outcomes of their interview. *Suppression Hr'g.*

On a final note, in responding to Mr. Ocean's question at the end of the interview whether he could "go back home now," Detective Podsiad said "we're going to let you go." However, as discussed, leading up to this point the record does not show that Mr. Ocean was in custody. Indeed, Detective Podsiad followed up by saying "I just wanted to explain all of that to you." The record shows that a reasonable person in Mr. Ocean's circumstances would have felt at liberty to terminate the interview and leave the vehicle at any time.

The Court does not mean to suggest that the Detectives and Mr. Ocean were merely passing the time of day. This was not a social conversation. The Detectives told Mr. Ocean up front that they were investigating drug dealing in the Bangor, Maine area and that they knew he was involved. Mr. Ocean had every right to be nervous, even—as he said—scared, and the Detectives let him know in no uncertain terms that they were interviewing him as part of their investigation. They also told him that he could be subject to very serious federal charges.

But the first narrow question here is whether Mr. Ocean was in custody as the law defines it and the Court concludes that he was not.

## B. Voluntariness of Confession

Involuntary confessions violate the due process clauses of the Fifth and Fourteenth amendments. *United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002).

In responding to Mr. Ocean's assertion that his confession was extracted involuntarily, the Government bears the burden of showing, based on the totality of the circumstances, that the investigating agents neither "broke" nor overbore his will. *Chambers v. Florida*, 309 U.S. 227, 239-40 (1940).  As such, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) (in context of voluntariness of confession, "[t]he relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers") (citation omitted).

Based on the totality of the circumstances, the Court concludes that Mr. Ocean's confession was voluntary and that his will was not overborn by abusive police practices.  As discussed, the record does not show that at any point there were threats of violence or immediate imprisonment, nor in the alternative is there a suggestion from law enforcement that if Mr. Ocean did cooperate, he would be offered immunity from prosecution.  Mr. Ocean voluntarily accompanied the Detectives to their vehicle, the interview was less than thirty minutes, the tone was cordial and respectful, and Mr. Ocean could have left the vehicle at any time.

## V.   CONCLUSION

The Court DENIES Mr. Ocean's Amended Motion to Suppress (ECF No. 281).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 9th day of June, 2016